252 So.2d 670

**GULF STATES UTILITIES COMPANY**

v.

**DIXIE ELECTRIC MEMBERSHIP CORPORATION.**

No. 51656.

Oct. 1, 1971.

Dissenting Opinion Oct. 11, 1971.

In re: Gulf States Utilities Company applying for certiorari, or writ of review, to the Court of Appeal, First Circuit, Parish of East Baton Rouge. 249 So.2d 360.

Application denied. There is no error of law under the facts found by the Court of Appeal.

SUMMERS, J., is of the opinion a writ should be granted and assigns written reasons.

SUMMERS, Justice (dissenting from the denial of writs).

Dixie Electric Membership Corporation is an electric cooperative organized and existing under Louisiana law (La.R.S. 12:-401 et seq.). Gulf States Utilities Company is an investor-owned public utility corporation organized in Texas and authorized to do business in Louisiana. Both operate within the parish of East Baton Rouge pursuant to franchises granted by the parish governing body. Both are engaged in the transmission and distribution of electricity to customers, some of which are along public rights of way.

Since 1941 Gulf States has maintained distribution lines and served customers along and within the right of way of Sunshine Road, Lavey Lane, Thomas Road, Plant Road, Comite Drive, Foster Road and Mickens Road in East Baton Rouge Parish. On March 16, 1968, Dixie Electric began a crash program to construct its distribution lines along these same roads par-

alleling and crossing the existing lines of Gulf States.

Based upon rights accorded by Section 403(11) of Title 12 of the Revised Statutes, before Dixie energized its lines, Gulf States applied for a mandatory injunction alleging that the construction of Dixie's transmission lines endangered and interfered with its facilities along the same roads. The statute relied upon permits a cooperative to maintain and operate electric transmission and distribution lines along public thoroughfares *"provided, that such construction and operation shall not interfere with the use and occupancy thereof by other public utilities."* (La.R.S. 12:403 [11]).

The trial judge granted a preliminary injunction finding that Dixie's construction did pose problems for Gulf States in the use of their facilities, not only from an economic standpoint, but as a safety hazard as well. On the nature of the danger and interference Dixie's lines would cause, the trial judge set forth in his written reasons for judgment:

The evidence, largely offered by Gulf States, showed that along the entire length of the newly constructed line there were at least twelve probable violations of the National Electric Safety Code caused by the erection of Dixie's poles and lines in too close proximity to those of Gulf States. While the National

Code's provisions do not have the effect of law, its pronouncements are respected in the electrical industry as establishing rules to be followed for safe conditions and avoidance of unnecessary hazards. Dixie conceded in several instances that there were Code violations which it avowed could be easily corrected with the Court's permission.

In addition, testimony elicited from several Gulf States witnesses indicated that, despite proposed correction of the safety violations by Dixie, an increased safety problem would be unavoidably presented in the future with paralleling and crossing primary distribution lines. It was in fact shown that over the five and a half (5½) mile extension of Dixie's line, these lines crossed Gulf States lines thirty six times. The operating superintendent of Gulf States, George Cannon, acknowledged steps could be taken under these conditions to conform to the National Code and to minimize hazards; however, he maintained this could only be done at an extra expense to Gulf States, which in certain instances would cost Gulf States nine (9) times more in providing service if Dixie had not located. This especially would be true where Gulf States attempts to serve new customers who might locate on these roads and Gulf States would be obliged to maintain necessary clearances above the roads and Dixie's lines to provide the service.

After the preliminary injunction had been issued, by stipulation Dixie was granted the right to correct the code violations and construction deficiencies in its lines. The matter was then resubmitted to the court on the issue of a permanent injunction. Without setting forth the facts upon which it relied, the court concluded at the trial of the permanent injunction that all of the code violations had been corrected, but also found,

"* * * it cannot be denied that the lines of Dixie which generally parallel those of Gulf States on the opposite side of the road in question, may cause Gulf States some annoyance and inconvenience, and in some instances additional expense; however, generally, these will be only the normal problems incident to the usual competition between utilities."

Relying upon an interpretation of Section 403(11) of Title 12 of the Revised Statutes by the Third Circuit Court of Appeal in Gulf States Utilities v. Jefferson Davis Electric Cooperative, Inc., 230 So.2d 273 (1969), the trial court ruled that "except in those cases where there is an *unreasonable* interference by the junior utility licensee, head to head competition between utilities and cooperatives is sanctioned and authorized under our present law and jurisprudence." (Emphasis added.) Thus, relying upon the Jefferson Davis Coop. Case, the court wrote into Section 403(11) that the

"interference" referred to there must be "unreasonable."

The trial court concluded by denying the permanent injunction.

It should be observed at this point that the issue is not Dixie's right to compete with Gulf States; the issue instead is the legislature's right to impose restrictions upon Dixie's use of public rights of way in the conduct of its operations.

Error was committed by the trial judge in relying upon the Jefferson Davis Coop. Case in which this court granted writs, the effect of which was to suspend the finality of the judgment in that case. 255 La. 276, 230 So.2d 586 (1970). Before the case could be heard and decided in this court it was dismissed on joint motion of the parties. Consequently, the Jefferson Davis Coop. Case was never final in any respect, it became a dead letter, and, therefore, not authoritative on any point.

When the case at bar was appealed to the First Circuit, the judgment of the trial court was affirmed on essentially the same grounds assigned by the trial judge in his written reasons for judgment. In addition, the Court of Appeal observed that expert engineering testimony disclosed that for Gulf States to cross Dixie's line with a primary single phase line would cost $253, and a thru-wire secondary drop would cost $169. The court found it to be implicit in its conclusions and findings that Dixie's

lines did not "materially" interfere with the rights of Gulf States. It then went on to quote from the Jefferson Davis Coop. Case to the effect that the "interference" contemplated by Section 403(11) of Title 12 was "unreasonable" interference. Interference in this case, the court held, was not "unreasonable." This the court believed to be statutory construction with "reason." 249 So.2d 360 (1971).

It is my view that by refusing to review these decisions our court has placed its imprimatur on judicial law-making contrary to fundamental principles of judicial restraint I believe to be essential to the judicial function.

Having been misguided by the Jefferson Davis Coop. Case the trial judge and Court of Appeal have rewritten the legislative mandate that the construction and operation of cooperatives' lines "shall not interfere with the use and occupancy" of public ways by other utilities. These courts have, in effect, stepped out of their roles as interpreters of the law and have made new law. The rule of the decisions under review is that there may be interference with the lines of other utilities so long as the interference is not "unreasonable" or so long as the junior utilities' construction does not "materially" interfere with the rights of the utility already there.

The use of the seemingly palatable terms "unreasonable" and "materially" does not mitigate the error into which the courts have fallen. To the contrary, the vagueness and indefiniteness of those terms simply grant license to the courts to decide every case as they deem fit, contrary to the very explicit and unequivocal prohibition of the legislature: construction and operation of junior utility facilities "shall not interfere" with the use and operation of utility facilities already in place along public ways.

The case before us is a classic example of the exercise of the license the courts have assumed: to decide each case as they deem fit despite the legislative mandate to the contrary. Here the court has found, as it necessarily had to find, that there was interference. Furthermore, in my view, even the erroneous standard the courts below have set for themselves have not been observed. This is so because the interference disclosed by this record was in fact "material" and "unreasonable." And if the interference is not "material" or "unreasonable" under the facts of this case, the great wonder of the rule the courts have fashioned is whether interference will ever be found to be "material" and "unreasonable" in future adjudications.

Aside from the facts recited in the opinions under review, which unmistakably evidence material and unreasonable interference, I will refer to the application for writs in this case. The application repre-

sents that the interference complained of by Gulf States resulted from the additional expense required to enable Gulf States to serve customers across the road from its lines and the additional expense involved in mantaining its facilities on account of increased hazards. It was indicated that along certain sections of the line, the expense involved in making extensions to Gulf States lines would be increased by as much as nine times because of Dixie's facilities on the opposite side of the road. Along a two and one-half mile segment of the line constructed by Dixie on Micken Road it is impossible for Gulf States to maintain adequate clearance for service connections in the center of the span between Dixie's poles. Relocation cost in the event the road rights of way are widened would be measurably increased.

All of the witnesses who testified recognized that a bad situation existed and it would worsen as time went by and as additional extensions of lines became necessary to serve new customers. The anticipated proliferation of electric facilities resulting from growth would exaggerate the danger to maintenance personnel and the hazard involved in line construction, with the consequent increased costs incident to coping with these hazards.

In my view judges in their cloistered chambers are ill-equipped to modify a specific legislative prohibition in this highly technical field, or for that matter in any other field in which legislation requires fact-finding, expert advice, inquiry, investigation and balancing the nuances of competing needs.

We have recently had examples of this court's failure to abide by an implicit constitutional mandate granting the Public Service Commission the right to regulate cooperative electric utilities in the same manner in which it regulated investor owned utilities. (Central Louisiana Electric Company v. Louisiana Public Service Commission, 253 La. 553, 218 So.2d 592 [1969]; Central Louisiana Electric Company v. Louisiana Public Service Commission, 251 La. 532, 205 So.2d 389 [1967] and Louisiana Power & Light Company v. Louisiana Public Service Commission, 250 La. 596, 197 So.2d 638 [1967]). As a result of these decisions the investor-owned and cooperative electric utilities were at war. A great deal of waste and expense necessarily resulted from this state of unregulation and chaos, all of which was and will have to be borne by the already overburdened consumer public. It was not until the legislature found it necessary to enact clarifying legislation implementing the constitutional command that the Public Service Commission should regulate all electric utilities investor-owned and cooperatives alike that the turmoil subsided. (Act 34 of 1970, La.R.S. 45:121, 122, 123).

Unfortunately, however, this hard-found tranquility is not to endure. The courts have again,'by failing to abide by clear and explicit legislation, injected confusion and uncertainty into a sensitive area of conflict between utilities where clarity and certainty existed. The result must inevitably be a rash of costly litigation, duplication of facilities and increased cost for maintenance and operation of all electric utilities serving customers from the same road rights of way, for interference is inherent in such a situation. The issue thus posed will only be resolved by legislation repudiating the unfortunate decisions which made this application for review necessary.

I must emphasize here that I believe courts should always try faithfully to follow the true meaning of legislative enactments as actually written, leaving to the legislature changes in its statutes, and leaving the problem of adopting laws to changing needs to legislative enactments or constitutional amendments approved by the people under constitutional procedures. Judges, I know, are not to apply laws as wooden rules in all cases, and some latitude is required to perform the judicial function. But this does not mean that in order to obtain results which particular judges may consider desirable at the time, judges may rewrite our laws under the guise of interpreting them. La.Civil Code arts. 13, 20. Judges ought to remember that their office is to interpret law, and not to make law, or give law.

Because judges should refuse to alter legislative enactments to meet new conditions, our system of laws is not thereby rendered powerless to meet change. To the contrary, there are many areas of positive law stating broad and general principles which allow judges to apply these principles to particular facts never envisaged in the original enactments. In this manner courts may accommodate the law to change. There are also many interstices in the law which legislators have wisely not preempted, regarding these areas as proper for judicial development. However, where the legislation is explicit and definite as it is here, and there are no dubious expressions, no principle of judicial construction allows courts to rewrite the law. To do so is to deny a proper respect for the legislative prerogative.

Constitutional and legislative processes are not so cumbersome that they cannot be utilized to adopt laws to changing times and conditions if the people truly desire that change. Time required for the legislative process to run its course can, when necessary, be adjusted to the desire and the need for the change. There is, moreover, profound wisdom in the Republican structure of our government which requires change to be sifted through the legislative process. It is a safeguard against irrational, hasty

and ill-considered actions. It is the technique of the times, however, for lawyers to seek change in the law through the courts and in doing so circumvent the legislative or constitutional amendment process where they cannot succeed. What is appalling is that they find such a readily receptive forum in the judiciary for these efforts.

I respectfully dissent.